William E. BENNETT,
Plaintiff-Appellant,

v.

PERINI CORPORATION,
Defendant-Appellee.

No. 74–1183.

United States Court of Appeals,
First Circuit.

Argued Dec. 3, 1974.

Decided Feb. 10, 1975.

David B. Kaplan, Boston, Mass., with whom Kaplan, Latti & Flannery, Boston, Mass., was on brief, for plaintiff-appellant.

James C. Gahan, Jr., Boston, Mass., for defendant-appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant, a carpenter by trade, was employed by appellee corporation and assigned to a crew doing cement form work in connection with one of the large concrete piers being poured for the Newport-Jamestown Bridge then under construction in Narragansett Bay. On March 5, 1969, appellant was injured in a fall from one of the pier faces to a platform approximately 15 feet below. He subsequently brought this action in admiralty seeking recovery on the customary counts. The district court, at the conclusion of appellant's evidence, granted appellee's motion for directed verdict, Fed.R.Civ.P. 50(a), and entered judgment for appellee on all 3 counts. We vacate the judgment and remand for a new trial.

The district court did not state the grounds upon which it directed a verdict, and we receive little enlightenment from the record since much of the argument of counsel and commentary by the court took place off the record.

Moreover, the moving party ignored Fed. R.Civ.P. 50(a) requiring that the specific grounds for a directed verdict be stated in the motion. As it is predictable that a directed verdict will generate an appeal, it would have been helpful to all concerned had the reasons which led the court to allow appellee's motion for directed verdict been preserved in some manner on the record.[1]

According to the parties, they understood the ground to be the conjectural nature of what occasioned appellant's fall. Conceivably (although there is nothing to indicate this to have been the case) the court might also have found that appellant lacked a remedy in admiralty against his employer on the ground that he was not a "seaman." Both questions were briefed and argued, and we address ourselves to both.

We turn first to whether appellant was a seaman within the meaning of the Jones Act, 46 U.S.C. § 688. In Offshore Company v. Robison, 266 F.2d 769, 779 (5th Cir. 1959), the Fifth Circuit said,

"[T]here is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips."

Since both elements of this test of evidentiary sufficiency turn upon the existence of a vessel, our initial inquiry is whether appellant was associated with any "vessel" as that term has been defined by maritime law. The evidence

---

1. A judge may be prompted to allow a motion in part because of concessions of fact, or other representations of counsel. Should this be the case, it is especially important that these considerations appear of record, as otherwise an appellate court has no way of taking them into account.

indicated that appellant was normally picked up each day at the dock in Newport and ferried out to the bridge pier by a tug operated by his employer, appellee. There he transferred to the "Scow 101," a steel-hulled barge owned by appellee and some 38 feet wide by 120 feet long. This barge was without motive power of its own and had to be towed from place to place. On it was mounted a large crane. Appellee utilized the barge in support of its bridge construction efforts, and there was evidence from which one could infer that it was moved to other piers along the 2½ mile long bridge, and could be used for other construction projects in and around navigable waters. At the time of the accident it was in navigable waters, tied up alongside the pier of the bridge from which appellant fell in such a manner that its crane could move materials for the bridge while its deck could be used as a storage area and work platform for the construction crews.

■ Appellant maintains that the Scow 101 is a vessel. The identical scow was held to support Jones Act recovery by a different plaintiff in Stafford v. Perini Corp., 475 F.2d 507 (1st Cir. 1973), although its status was apparently not at issue in that case. See Powers v. Bethlehem Steel Corp., 477 F.2d 633, 648 (1st Cir.), cert. denied, 414 U.S. 856, 94 S.Ct. 160, 38 L.Ed.2d 106 (1973). While not everything that floats is a vessel, id. at 647 n. 4, we think a jury could find that this craft was one of the "special purpose floating structures" which the maritime law has included within the term. Id. at 647–48; Robison, supra; see generally 7A Moore's Federal Practice ¶ .215 [4]. Whether a marginal structure is a vessel is a question for the jury unless the craft is clearly outside any permissible understanding of the term. In those "rare cases" where rafts or barges have been held, as a matter of law, not to be vessels, it has often been because of their close similarity to floating docks or dry-docks, traditionally regarded as extensions of land. Thus a wooden staging used by workmen repairing piles under a pier was not a vessel, Powers, nor was a specially-constructed barge ordinarily tied to the shore and used to fabricate concrete barges. Cook v. Belden Concrete Products, Inc., 472 F.2d 999 (5th Cir.), cert. denied, 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 (1973). While Scow 101 bears certain similarities to craft of this description, its seagoing range and versatility are greater. The determinative factors are "the purpose for which the craft was constructed and the business in which it is engaged." The Robert W. Parsons, 191 U.S. 17, 30, 24 S.Ct. 8, 12, 48 L.Ed. 73(1903). To be a vessel, the purpose and business must to some reasonable degree be the "transportation of passengers, cargo, or equipment from place to place across navigable waters." Powers at 477 F.2d 647. A major function of Scow 101 appears to have been the transportation of the structural materials and tools used to build the bridge and the crane across the navigable waters of Narragansett Bay. We cannot say as a matter of law that Scow 101 was not a vessel. Robison, supra, 266 F.2d at 779–80; Powers, supra, 477 F.2d at 646. See Senko v. LaCrosse Dredging Corp., 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404, rehearing denied, 353 U.S. 931, 77 S.Ct. 716, 1 L.Ed.2d 724 (1957); Gianfala v. Texas Co., 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775 (1955).

■ We next inquire whether there was evidence that appellant was "assigned permanently" to Scow 101 or "performed a substantial part of his work" thereon, and whether he "contributed to the function of [Scow 101] or to the accomplishment of its mission, or to [its] operation or welfare . . . during its movement or during anchorage . . . ." Robison, supra, 266 F.2d at 779. Evidence was introduced that appellant was employed to work with the large wooden panels which were used to form molds into which the wet cement for the bridge pier was poured. His duties included constructing the panels and preparing them for assembly, fitting them together after they had been hauled into place by the barge crane,

disassembling and removing the panels when the cement had hardened, and repairing and reshaping them for reuse on another portion of the pier. While much of this work necessarily took place on the pier itself, there was evidence that a major part of the carpentry work was regularly done on the deck of Scow 101, where the additional space provided a necessary platform for constructing and reworking the panels. While it does not appear how much time on the average was spent on the barge, it was owned by his employer and at least from appellant's evidence there is sufficient connection to present a jury issue under the first element of the *Robison* test.

The second element is perhaps harder to perceive. Nonetheless, the "mission" of Scow 101 was to provide a support base for the construction of the bridge piers. Appellant's duties, if not obviously maritime, related to that function and were arguably essential for its satisfactory performance. *Cf.* Harney v. William M. Moore Bldg. Corp., 359 F.2d 649, 654–56 (2d Cir. 1964). We are satisfied that on this record plaintiff is entitled to have the question decided by a jury. *See Stafford, supra,* 475 F.2d at 510;[2] *Senko, supra; Gianfala, supra;* H. Baer, Admiralty Law of the Supreme Court 180–89 (2d ed. 1969).

 We next consider whether there was sufficient evidence of negligence to permit appellant to go to the jury on Count I. The Jones Act is to be construed remedially, and it is fair to say that the threshold of evidentiary sufficiency is somewhat lower than in tort actions at common law. Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391,

92 L.Ed. 468 (1948); Schulz v. Pennsylvania R. R., 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668 (1956); G. Gilmore & C. Black, The Law of Admiralty § 6–36 (1957); *cf.* Rogers v. Missouri Pacific R. R., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957) ("the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."). The concept of what constitutes negligence is broader, perhaps because of the employer-employee setting,[3] and defendant's negligence need only be a contributing factor rather than a primary cause of injury. Peymann v. Perini Corp., 507 F.2d 1318 (1st Cir. 1974). Our task, moreover, in reviewing the propriety of a directed verdict is to consider the evidence in the light most favorable to the losing party. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); Getty v. Boston & Maine Corp., 505 F.2d 1226 (1st Cir. 1974). Applying these standards, we find sufficient evidence of negligence and causation to have gone to the jury. While no one saw appellant fall, it could be inferred that his fall was caused by the impact of dropping snow and ice, and that the decision to send him aloft in the face of prevailing conditions amounted to negligence.

There was testimony that it had snowed heavily prior to the day of the accident and that the bridge surfaces were fairly deep in snow when the men reported for work on that day. Several witnesses testified to observing "chunks"

---

**2.** In *Stafford* we sustained a jury verdict supported by substantially similar evidence. We recognize, of course, that appellee has yet to present its evidence of the extent of appellant's connection with the vessel, and do not in any sense mean to determine the question finally at this time.

**3.** *See* Kernan v. American Dredging Co., 355 U.S. 426, 432, 78 S.Ct. 394, 398, 2 L.Ed.2d 382 (1958):

"The FELA and the Jones Act impose upon the employer the duty of paying dam-

ages when injury to the worker is caused, in whole or in part, by the employer's fault. This fault may consist of a breach of the duty of care, analogous but by no means identical to the general common-law duty . . . ."

*See also* Dennis v. Denver & Rio Grande Western R. R., 375 U.S. 208, 84 S.Ct. 291, 11 L.Ed.2d 256 (1963); Johnson v. Griffiths S. S. Co., 150 F.2d 224 (9th Cir. 1945).

of ice and snow sliding off the bridge trusswork above and falling into the water or onto the pier where the accident occurred. There was further testimony that the frequency of these chunks of ice and snow breaking loose increased as the day progressed.

In the afternoon appellant and a coworker were sent up on the pier to initiate removal of some of the wooden forms. The cement had been poured sometime previously and had hardened sufficiently to necessitate these preliminary operations. In the course of this work the men worked on the steep face of the pier, standing on projections from the forms and securing themselves in place by means of safety belts. The nature of the work was such, however, that they were frequently required to move about, and, while doing so, they could not utilize their safety belts.

At the time of the accident appellant was moving across the pier face in order to assist his coworker on a difficult task. He had unfastened his safety belt for this maneuver, and there was testimony that this action was both necessary and predictable. Appellant testified to then receiving a "big whack that knocked me down," although he was unable to identify what had hit him. His coworker, who was at that moment slightly to the right of and below appellant, also did not see what, if anything, struck appellant. But he testified to being hit himself at that moment by something which "felt like ice and snow." He hugged the pier to protect himself, and, hearing a loud crash, he turned to see appellant sprawled on the platform below.

Another witness testified to hearing snow fall on the pier immediately followed by a man's yell, and to then turning and observing appellant lying on the platform. He further testified that when he reached appellant he was cov-

ered with snow "almost like he'd been packed" in it.

This testimony would support an inference that appellant had been struck by a chunk of ice or snow falling from the bridge surface above and that this dislodged him from his precarious perch and caused him to fall to the platform below. *See* Admiral Towing Co. v. Woolen, 290 F.2d 641, 649–52 (9th Cir. 1961).

Moreover, there was evidence which, if believed, tended to establish that appellee's foreman knew or should have known that the snow and ice was falling and posed a hazard to men working on the pier and that the work to which appellant was assigned necessitated his unfastening his safety belt on occasion. A jury question was presented as to whether sending the men to work on that day was, under the circumstances, reasonable and prudent. *See* Dennis v. Denver & Rio Grande Western R. R., 375 U.S. 208, 209, 84 S.Ct. 291, 293, 11 L.Ed.2d 256 (1963) (Did employer take "all necessary and reasonable precautions to prevent injury"?); Peterson v. Permanente Steamship Corp., 127 Cal.App.2d 579, 277 P.2d 495, cert. denied, 349 U.S. 953, 75 S.Ct. 882, 99 L.Ed. 1278 (1955) (What would "reasonably prudent superior" have done under the circumstances?). There was also a jury question as to whether the safety equipment was adequate. We therefore hold that the district court erred in directing a verdict on Count I. *See* Butler v. Whiteman, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958). Needless to say we do not suggest that the evidence of negligence was conclusive on either point; merely that plaintiff was entitled to have the jury consider his case after defendant had had an opportunity to put in its own evidence.

Appellant also sought recovery for unseaworthiness. On appeal,[4] he argues al-

---

4. In his notice of appeal, appellant purported to appeal only "from the order of the [District] Court granting defendant's motion for directed verdict on Count I . . . ." While this designation appears to be insufficient under Fed.R.App.P. 3(c), appellee did not object but briefed and argued the issue of evidentiary sufficiency on Count II. Thus, we perceive no claim of prejudice and, in the exercise of our discretion, will treat Count II as properly before us. *See* 9 Moore's Federal Practice ¶ 203.18.

ternatively that a jury could find that his injuries were the result of the unseaworthy condition of his safety belt in that it was not designed so that it could be kept continually fastened while he was on the pier face; or that the Scow 101 was improperly moored and because of this "contributed" to his injuries. In support of the latter theory he contends that vibrations resulting from the wave-driven scow striking the pier could somehow have aggravated the fall of snow and ice from the bridge surfaces.

Neither of these theories seems especially persuasive. But in view of the fact that a new trial is to be held in this case, we do not at this juncture foreclose an unseaworthiness claim. We leave it to the district court to determine on the evidence presented at the trial whether there is sufficient evidence of unseaworthiness to go to the jury.

As to Count III, maintenance and cure, its dismissal has been neither appealed from (see note 4 supra) nor briefed and argued. We consider judgment on that count to be final.

Vacated and remanded.