In re the Complaint of the SEA VESSEL, INC., for Exoneration from or Limitation of Liability as the Owner of the M/V SEA LION V, Appellant,

v.

Juan REYES, Appellee.

No. 93–4291.

United States Court of Appeals, Eleventh Circuit.

June 20, 1994.

Reginald M. Hayden, Jr., James N. Hurley, Hayden and Milliken, P.A., Miami, FL, for appellant.

**346**

Adam H. Lawrence, Lawrence & Daniels, Miami, FL, for appellee.

Before COX and DUBINA, Circuit Judges, and CLARK, Senior Circuit Judge.

COX, Circuit Judge:

On appeal, we address the issue of whether a case involving damages resulting from a fire on a vessel undergoing routine repairs in a dry dock on a navigable waterway is cognizable in admiralty. We hold that admiralty jurisdiction attaches.

## I. BACKGROUND

Sea Vessel, Inc. ("Sea Vessel") is the owner of the M/V SEA LION V ("SEA LION V"), a commercial cargo vessel. (R.1–1 at 1). Sea Vessel filed a complaint for exoneration from or limitation of liability as the owner of the SEA LION V for damages resulting from a fire that erupted on that vessel. (*Id.*). In its complaint, Sea Vessel alleges that in October of 1991, the SEA LION V was drydocked for routine repairs and maintenance at Miami Shipyards. (*Id.* at 2).[1] Sea Vessel further alleges that on November 11, 1991, several shipyard workers were welding on board the SEA LION V, which was still in dry dock, when a fire erupted on the vessel. (R.1–1 at 2).[2] Finally, Sea Vessel alleges that the fire killed two of the shipyard workers, including Orlando Umanzor, and critically injured a third. (*Id.*).

Potential claimant Juan Reyes ("Reyes"), personal representative of the estate of Orlando Umanzor, filed a motion to dismiss Sea Vessel's complaint for lack of admiralty jurisdiction. (R.1–16). Therein, Reyes argues "[i]t is clear from the face of Sea Vessel's complaint that the fire on the Sea Lion V did not occur on navigable waters[,] . . . . [f]ires in drydock, under these circumstances, do not satisfy the locality test for maritime torts." (*Id.* at 3). Alternatively, Reyes argues that "[e]ven if, *arguendo*, Sea Vessel could satisfy the locality requirement for maritime tort jurisdiction, [Sea Vessel] would still be unable to satisfy the nexus requirement." (*Id.*). Reyes also asserts that "information gathered to date suggests that the work being done to Sea Lion V was far more extensive and unplanned than" mere scheduled routine repairs. (R.1–16 at 2). In support of that contention, in a footnote to his motion, Reyes references a statement allegedly made by "Miami Shipyards chief [of] supervision, Luis Paez." (*Id.*).

In response to Reyes's motion to dismiss, Sea Vessel counters that the "SEA LION V sailed into Miami Shipyards for her scheduled routine steel work which included replacing side steel plating in the forward one-third of the vessel, replacement of tank bulkheads and swash plates as necessary." (R.1–19 at 2).[3] Sea Vessel contends that allegations of a fire on a vessel undergoing routine repairs in dry dock satisfy the nexus requirement, that the SEA LION V was on navigable waters at the time of the fire, and that Reyes's motion to dismiss should therefore be denied. (*Id.* at 5–8).

A magistrate judge concluded "that admiralty jurisdiction is lacking as the [SEA

---

**1.** Miami Shipyards is located on the Miami River. (R.1–31 at 1). At oral argument, Reyes's counsel conceded that the Miami River is a navigable waterway. Regardless, we take judicial notice of that fact. Fed.R.Evid. 201.

**2.** The SEA LION V had undergone repairs in dry dock for approximately three weeks prior to the fire. (R.1–1 at 2).

**3.** We note, parenthetically, that in its response to Reyes's motion to dismiss, Sea Vessel more specifically describes the SEA LION V as being in a shiplift dry dock:

A shiplift type dry dock acts like a large elevator which can be lowered into the water. Once the elevator floor (platform) is lowered

below the hull of the vessel, the vessel can be positioned over the platform (which has a cradle to support the hull of the vessel) then the elevator platform and vessel are lifted vertically until the vessel clears the water and underwater body inspection and repairs can be made. Once the repairs are completed, the shiplift is lowered placing the vessel back into the water and then maneuvered free of the shiplift.

(R.1–19 at 2). Subsequent to its Response, Sea Vessel identified the shiplift as a "Syncro-lift." (R.1–37 at 3–4). A detailed description of a Syncro-lift dry dock is found in *Kelso Marine, Inc. v. Hollis*, 316 F.Supp. 1271, 1272 (S.D.Tex. 1970), aff'd, 449 F.2d 342 (5th Cir.1971). The exact nature of the "dry dock" is not material to our resolution of this case.

LION V] was not on navigable waters" and recommended that Reyes's motion to dismiss be granted. (R.1–31 at 7–8). The district court adopted the magistrate judge's report and recommendation and dismissed the action for lack of subject matter jurisdiction. (R.1–38 at 3). In finding a lack of subject matter jurisdiction, the district court arrived at the following conclusions: (1) "[A] fire on a vessel, not docked at a marina *on* navigable waters, but, raised from the water three weeks prior to the incident—does not satisfy the requirement of potential disruption to commercial maritime activity." (*Id.* at 1); (2) "[T]he **drydock** repairs in this case do not elevate the claim to a substantial relationship with traditional maritime activities." (*Id.* at 1–2); (3) "[T]he drydock in this case cannot be considered anything other than an extension of land to which admiralty and maritime jurisdiction does not attach." (*Id.* at 2); (4) "[T]he Limitation of Liability Act ... does not provide Reyes with an independent basis of admiralty jurisdiction." (*Id.*); and, (5) "[T]he vessel was out of the water only for the scheduled repairs and was 'certainly withdrawn from navigation.'" (*Id.* at 3). The district court's order did not, however, turn on the nature of repairs made to the SEA LION V. (R.1–38). Stated otherwise, the district court did not resolve any factual dispute that might exist regarding the nature of the repairs made to the SEA LION V. (*Id.*). Nor do we resolve any such conflict. In its complaint, Sea Vessel alleges that "[o]n November 11, 1991, the M/V SEA LION V ... was in drydock undergoing scheduled routine repair and maintenance." (R.1–1 at 2). We accept that allegation as true for purposes of reviewing the district court's dismissal of Sea Vessel's complaint. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (11th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980).

## II. ISSUES ON APPEAL & CONTENTIONS OF THE PARTIES

Sea Vessel contends that the SEA LION V was on admiralty waters, that routine repairs

to a vessel in dry dock bear a significant relationship to traditional maritime activity, and that the fire constituted a potential threat to maritime commerce. Sea Vessel argues, therefore, that the district court erred in dismissing the action for lack of admiralty jurisdiction.[4] Reyes counters that a dry dock is an extension of the land and the SEA LION V was therefore not on admiralty waters. Further, Reyes argues that even if the SEA LION V was on admiralty waters, routine repairs to a vessel in dry dock do not bear a significant relationship to traditional maritime activity. Finally, Reyes argues that the fire did not constitute a potential threat to maritime commerce. Accordingly, Reyes contends that the district court did not err in dismissing Sea Vessel's complaint for want of admiralty jurisdiction.

## III. STANDARD OF REVIEW

We review a district court's determination that it is without subject matter jurisdiction de novo. *Barnett v. Bailey*, 956 F.2d 1036, 1039 (11th Cir.1992). A motion to dismiss for lack of subject matter jurisdiction can be based on lack of jurisdiction on the face of the complaint. *Menchaca*, 613 F.2d at 511. "A 'facial attack' on the complaint requires the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id.* That is, "the nonmoving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n. 6 (8th Cir.1990). "The general rule is that a complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 729–30 n. 6 (citations and internal quotation marks omitted).

## IV. DISCUSSION

Our task is to determine whether this case is cognizable in admiralty. Federal

---

**4.** Sea Vessel contends, on appeal, that its repair contract with Miami Shipyards, a maritime contract, serves as an alternative basis for admiralty jurisdiction. Because we conclude that Sea Vessel's complaint is cognizable in admiralty based on a maritime tort, we do not address this contention.

admiralty jurisdiction derives from Article III, Section 2, of the United States Constitution, which extends the judicial power of the United States "to all Cases of admiralty and maritime Jurisdiction." Pursuant to that grant of jurisdiction, Congress enacted 28 U.S.C. § 1333(1) wherein it vests district courts with original and exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." Historically, admiralty tort jurisdiction depended solely upon the locality of the wrong—"[i]f the wrong occurred on navigable waters, the action [was] within admiralty jurisdiction; if the wrong occurred on land, it [was] not." *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972). In *Executive Jet*, the Supreme Court retreated from the "purely mechanical application of the locality test," and held that "the wrong [must also] bear a significant relationship to traditional maritime activity"—the nexus test. *Id.* at 261, 268, 93 S.Ct. at 501, 504.[5] Thus, we must consider the situs of the fire (locality test) as well as the relationship between a fire on a vessel in dry dock undergoing routine repairs and traditional maritime activity (situs test) in order to determine whether this case is cognizable in admiralty.[6]

## A. THE LOCALITY TEST

■ As we navigate through this jurisdictional fog, we must first determine whether the SEA LION V was on navigable waters at the time of the fire. In its complaint, Sea Vessel simply alleges that the SEA LION V was in dry dock at the time of the fire. (R.1–1 at 1). Reyes takes that bare allegation, that the SEA LION V was in dry dock, and

reads it to conclude "that the fire on the Sea Lion V did not occur on navigable waters." (R.1–16 at 3). Reyes's conclusion begs the question. And, we address that very question: Whether a vessel in dry dock on a navigable waterway is in or on navigable waters for purposes of admiralty jurisdiction.

The Supreme Court has said that a vessel in dry dock is on water, not on land, for purposes of admiralty jurisdiction. In *The Robert W. Parsons*, the Supreme Court stated:

> All injuries suffered by the hulls of vessels below the water line, by collision or stranding, must necessarily be repaired in a dry dock, to prevent the inflow of water, but it has never been supposed, and it is believed the proposition is now for the first time made, that such repairs were made on land. Had the vessel been hauled up by ways upon the land and there repaired, a different question might have been presented, as to which we express no opinion; but, as all serious repairs upon the hulls of vessels are made in dry dock, the proposition that such repairs are made on land would practically deprive the admiralty courts of their largest and most important jurisdiction in connection with repairs. No authorities are cited to this proposition, and it is believed none such exist.

191 U.S. 17, 33–34, 24 S.Ct. 8, 13, 48 L.Ed. 73 (1903). *The Robert W. Parsons* was reaffirmed in *Simmons v. The Steamship Jefferson*, wherein the Supreme Court stated:

> In reason, we think it cannot be held that a ship or vessel employed in navigation and commerce is any the less a maritime subject within the admiralty jurisdiction when, for the purpose of making necessary re-

---

**5.** *Executive Jet* involved a jet aircraft that, at takeoff, struck a flock of sea gulls and sank in navigable waters. *Executive Jet*, 409 U.S. at 250, 93 S.Ct. at 495. Thereafter, the Supreme Court recognized "that the *Executive Jet* requirement that the wrong have a significant connection with traditional maritime activity is not limited to the aviation context." *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982).

**6.** The district court correctly concluded that the Limitation of Liability Act does not provide an independent basis for admiralty jurisdiction.

*Lewis Charters, Inc. v. Huckins Yacht Corp.*, 871 F.2d 1046, 1054 (11th Cir.1989); *see also Guillory v. Outboard Motor Corp.*, 956 F.2d 114, 115 (5th Cir.1992), *David Wright Charter Serv. v. Wright*, 925 F.2d 783, 785 (4th Cir.1991), *Three Buoys Houseboat Vacations U.S.A. Ltd. v. Morts*, 921 F.2d 775, 779–80 (8th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 272, 116 L.Ed.2d 224 (1991); *but see Sisson v. Ruby*, 497 U.S. 358, 359 n. 1, 110 S.Ct. 2892, 2894 n. 1, 111 L.Ed.2d 292 (1990) (recognizing that whether the Limitation of Liability Act is an independent basis for admiralty jurisdiction remains an open question).

pairs to fit her for continuance in navigation, she is placed in a dry dock and the water removed from about her, than would be such a vessel if fastened to a wharf in a dry harbor, where, by the natural recession of the water by the ebbing of the tide, she for a time might be upon dry land. 215 U.S. 130, 142, 30 S.Ct. 54, 58, 54 L.Ed. 125 (1909). Both *The Robert W. Parsons* and *The Steamship Jefferson* involved suits in contract. In *Gonsalves v. Morse Dry Dock & Repair Co.*, however, the Supreme Court applied the aforementioned principle articulated in *The Robert W. Parsons* to suits in tort. 266 U.S. 171, 45 S.Ct. 39, 69 L.Ed. 228 (1924) (recognizing that a vessel in a floating dry dock is on water, not on land, for purposes of admiralty tort jurisdiction). These decisions may be old, but they are old precedent, and we are bound to follow them.[7]

Reyes cites no authority that would compel this court to question the continued vitality of *The Robert W. Parsons*. Instead, Reyes advances an argument that is unpersuasive and fails to take into account the triad of Supreme Court cases cited herein. Reyes contends that a dry dock constitutes an "extension of land." Reyes cites a host of cases in support of the proposition that a vessel resting on an extension of land is not in or on navigable waters. Reyes notes that the SEA LION V was in dry dock at the time of the fire. Therefore, Reyes opines, the SEA LION V was not in or on navigable waters. Reyes's argument, albeit logical, is rooted in a false premise—that a dry dock is an extension of land such that admiralty jurisdiction does not attach.

Reyes bottoms his argument on a group of cases that do not support his position. *See, e.g., DiGiovanni v. Traylor Bros., Inc.*, 959

F.2d 1119, 1124 (1st Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992) (concluding that a repair barge was not a vessel in navigation for purposes of the Jones Act); *Bender Shipbuilding & Repair Co., Inc. v. Brasileiro*, 874 F.2d 1551, 1555 (11th Cir.1989) (recognizing that a dry dock moored, and in use as a dry dock, is not a vessel); *Johnson v. Beasley Constr. Co.*, 742 F.2d 1054, 1063 n. 8 (7th Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1180, 84 L.Ed.2d 328 (1985) (concluding that a construction barge was a vessel in navigation, but noting that dry docks are typically not regarded as vessels but "as nothing more than extensions of land"); *Bennett v. Perini Corp.*, 510 F.2d 114, 116 (1st Cir.1975) (concluding that a jury could find that a construction barge was a vessel, but recognizing that dry docks are "traditionally regarded as extensions of land" and not as vessels); *Cook v. Belden Concrete Prod., Inc.*, 472 F.2d 999, 1002 (5th Cir.), *cert. denied*, 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 (1973) (holding that a construction vessel was not a vessel, and noting that dry docks are not considered vessels when moored and in use as dry docks). *Dirma v. United States*, 695 F.Supp. 714, 718 (E.D.N.Y.1988), cited by Reyes, does support his position, but we decline to follow it.

As to the question of whether the SEA LION V was on navigable waters at the time of the fire, we conclude that the Supreme Court precedent discussed herein is determinative. Accordingly, we hold that the SEA LION V was in or on navigable waters at the time of the fire.

## B. THE NEXUS TEST

■ We must next consider whether routine repairs to a vessel in dry dock "bear a

---

**7.** This court has not previously addressed the issue of whether a vessel in dry dock is on water or land for purposes of admiralty jurisdiction. In *Flowers v. Travelers Ins. Co.*, 258 F.2d 220 (5th Cir.1958), *cert. denied*, 359 U.S. 956, 79 S.Ct. 741, 3 L.Ed.2d 764 (1959) (which is binding on this court per *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc)), the Fifth Circuit concluded that "[t]he vessel, if not actually floating *in* navigable waters, was there in law.... she was in a floating drydock which by all tests made the place of injury maritime." *Id.* at 221. *Flowers*, however, was a Longshore

and Harbor Workers' Compensation Act ("LHWCA") case. *Id.* Under the LHWCA, navigable waters includes an "adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C.A. § 903(a) (West 1986). Thus, in some instances, the LHWCA extends to localities outside the ambit of admiralty tort jurisdiction. Accordingly, we cannot rely on *Flowers* in determining whether the SEA LION V was on navigable waters for purposes of admiralty tort jurisdiction.

**350**

significant relationship [nexus] to traditional maritime activity." *Executive Jet,* 409 U.S. at 268, 93 S.Ct. at 504. The nexus test involves two queries: (1) Did the incident have a "potentially disruptive impact on maritime commerce"? *Sisson,* 497 U.S. at 363, 110 S.Ct. at 2896; and (2) Does a "substantial relationship" exist "between the activity giving rise to the incident and traditional maritime activity"? *Id.* at 364, 110 S.Ct. at 2897.

*Sisson* involved a pleasure yacht, the *Ultorian,* that was docked at a marina on navigable waters. *Id.* at 360, 110 S.Ct. at 2894. A fire erupted on the *Ultorian,* destroying it and damaging other vessels and the marina. *Id.* The Supreme Court held that admiralty jurisdiction attached. *Id.* at 359, 110 S.Ct. at 2894.

As to the first query of the nexus test, *Sisson* counsels that:

> [t]he jurisdictional inquiry does not turn on the *actual* effects on maritime commerce of the fire on Sisson's vessel; nor does it turn on the particular facts of the incident in this case, such as the source of the fire or the specific location of the yacht at the marina, that may have rendered the fire on the *Ultorian* more or less likely to disrupt commercial activity. Rather, a court must assess the general features of the type of

incident involved to determine whether such an incident is likely to disrupt commercial activity. Here, the general features—a fire on a vessel docked at a marina on navigable waters—plainly satisfy the requirement of potential disruption to commercial maritime activity.

*Id.* at 363, 110 S.Ct. at 2896. The SEA LION V was in dry dock on the Miami River, a navigable waterway, when a fire erupted on board. We find no material difference between the facts in *Sisson* and the instant case. The fire on the SEA LION V *could* have spread to other vessels and *could* have resulted in the obstruction of a navigable waterway—the Miami River. Accordingly, we conclude that the fire on board the SEA LION V constituted a potential disruption to maritime commerce.[8]

■  As to the second query of the nexus test, we must determine whether Sea Vessel alleges facts that demonstrate "a substantial relationship between the activity giving rise to the incident and traditional maritime activity." *Sisson,* 497 U.S. at 364, 110 S.Ct. at 2897.[9] The relevant activity in the instant case was the routine repair of a vessel in a dry dock on navigable waters.[10] Therefore, we must determine whether the routine repair of a vessel in a dry dock has "a substan-

---

**8.** Reyes makes much of the fact that Sea Vessel suggests, for the first time in its brief on appeal, that another vessel was near the SEA LION V at the time of the fire. (Appellee's Br. at 18–19). Whether another vessel was actually near the Sea LION V is not material. As *Sisson* instructs, "[t]he jurisdictional inquiry does not turn on ... the particular facts of the incident in the case.... [r]ather, ... whether such an incident is likely to disrupt commercial activity." *Sisson,* 497 U.S. at 363, 110 S.Ct. at 2896.

**9.** Our court has utilized the four-factor test enunciated by the former Fifth Circuit in *Kelly v. Smith,* 485 F.2d 520, 525 (1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558, (1974), in order to determine whether an activity bears a substantial relationship to a traditional maritime activity. In *Sisson,* the Supreme Court recognized that the *Kelly* test was only one approach to judging admiralty nexus. 497 U.S. at 365 n. 4, 110 S.Ct. at 2897 n. 4. Recently, in *Penton v. Pompano Constr. Co., Inc.,* 976 F.2d 636 (11th Cir.1992), this court engaged in a "nexus analysis" without directly referencing the *Kelly* factors. We continue to recognize the *Kelly* test as a permissive, as opposed to mandatory, tool.

**10.** The SEA LION V, as a vessel temporarily in dry dock for routine repairs, continued to be a vessel "in navigation" at the time of the fire. *See Bodden v. Coordinated Caribbean Transp., Inc.,* 369 F.2d 273, 275 (5th Cir.1966). Reyes insists that the SEA LION V was "withdrawn from navigation" at the time of the fire. We find the cases proffered in support of that contention readily distinguishable. *See, e.g., David Wright Charter Serv. v. Wright,* 925 F.2d 783, 784 (4th Cir.1991) (holding that a vessel "placed on blocks to undergo repairs in a shed located 75 feet from the water" did not "satisfy the situs test for admiralty jurisdiction"); *Lewis Charters, Inc. v. Huckins Yacht Corp.,* 871 F.2d 1046, 1053 (11th Cir.1989) (holding that a boat *stored* in the wet berth of a paint facility "was certainly withdrawn from navigation"); *Latin American Property & Casualty Ins. Co. v. Hi–Lift Marina, Inc.,* 887 F.2d 1477, 1480 (11th Cir.1989) (relying on *Lewis* and concluding that a vessel in storage does not satisfy the nexus requirement); *In re Complaint of Dickenson,* 780 F.Supp. 974, 975 (E.D.N.Y.1992) (holding no admiralty jurisdiction where a vessel had undergone repairs 50 feet from the water).

tial relationship to a 'traditional maritime activity.'" *Id.* at 365, 110 S.Ct. at 2897. In *Sisson,* the Supreme Court held that "maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity.'" *Id.* at 367, 110 S.Ct. at 2898. We conclude that the routine repair of a vessel clearly falls under the rubric of "maintenance." It is axiomatic that the routine repair of vessels is a crucial maritime activity.[11] Accordingly, we conclude that the routine repair of a vessel in a dry dock on navigable waters bears a significant relationship to a traditional maritime activity such that admiralty jurisdiction attaches.

## V. CONCLUSION

For the foregoing reasons, we REVERSE the district court's dismissal of Sea Vessel's complaint for want of admiralty jurisdiction and REMAND for further proceedings.

REVERSED and REMANDED.

**11.** We note, albeit a "pre-nexus" case, that in *Gonsalves,* the Supreme Court held that admiralty jurisdiction attached where a worker, engaged in the repair of a vessel in dry dock, was injured when a blow torch exploded. 266 U.S. at 171, 45 S.Ct. at 39.